**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 20, 2021

**BY ECF**
Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

**Re: United States v. Christian Nieves, 19 Cr. 354 (JSR)**

Dear Judge Rakoff:

The Government submits this letter in advance of the July 27, 2021 sentencing of defendant Christian Nieves. For the reasons set forth below, the Government respectfully submits that a sentence of 63 to 78 months' imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing.

## I. Factual Background

### A. The Offense Conduct

The offense of conviction stems from the defendant's membership in the Trinitarios street gang. (Presentence Investigation Report ("PSR") ¶ 11.) The defendant was a member of a set of the Trinitarios called El Combo. Other members of El Combo included the victim in the case (the "Victim"), who met the defendant through the gang in about 2008 or 2009. (Id.; Trial Transcript ("Tr.") 130.)

The Trinitarios had an on-going rivalry with the gang Dominicans Don't Play ("DDPs"), and in 2018, a member of the DDPs, Stiven Siri-Reynoso, was tried on charges that included racketeering conspiracy, narcotics conspiracy, and murder, which related in part to violence between the DDPs and the Trinitarios. (PSR ¶ 14.) At that July 2018 trial, the Victim testified as a Government cooperating witness and, in the course of his testimony (the "Prior Victim Testimony"), the Victim testified about crimes that he had engaged in, including an incident in 2009 when the Victim took a gun from the defendant after a gang-related shooting. (Id. ¶ 16.) The shooting was itself the subject of a federal investigation, and evidence developed in that investigation showed that, before passing off the gun to the Victim, the defendant had shot the gun and that a person named Issi Dominguez had been struck and killed. (Id. ¶ 11.)

The Victim's testimony at the Siri-Reynoso trial about the defendant's involvement in the Dominguez killing violated the Trinitarios' strictures against cooperating with law enforcement;

among other things, the Trinitarios code calls for members to retaliate against, or even kill, confirmed cooperators. (Id. ¶ 15.)

The Victim was released from custody a few months after the Siri-Reynoso trial, in December 2018. Shortly thereafter, two members of the El Combo Trinitarios—"Casper" and "Taliban"—visited the Victim to ask whether he had cooperated. The Victim lied and said he had not. (Id. ¶ 17.)

On the evening of February 5, 2019, as the Victim walked past a building in the Bronx, he noticed that the defendant and other El Combo gang members were hanging around the entrance. (Id. ¶ 18.) As the Victim walked past, one of the group called out to him, and the defendant and at least one other person began following the Victim. The Victim continued to walk and then stopped when he saw an acquaintance he recognized, hoping that the presence of another person would forestall violence. The Victim was wrong. The defendant walked right up to the Victim, took out a razor blade and slashed at the Victim's face, cutting him down the jawline. (Id.) A photograph of the injury, admitted at trial as Government Exhibit 210, is annexed hereto as Exhibit A. During the attack, the defendant told the Victim "this is happening to you because you are a snitch." (Id.)

The day following the slashing, February 6, the Victim received numerous phone calls and text messages from defendant Elias Polanco, another El Combo Trinitarios member. (¶ 19.) In the text messages, Polanco told the Victim to "keep my name out your mouth," meaning that the Victim should stop talking about Polanco. On one of the calls, Polanco told the Victim that Polanco knew where the Victim was, that the Victim should not tell anyone that Polanco was involved with what happened, and that Polanco would "come over" to where the Victim was. (Id.) On that same call, the defendant got on the line to say that it was a good thing what happened to the Victim because the Victim was a snitch. (Id.; see also Tr. 209–11.)

At trial, the Government showed that Polanco's cellphone contained, among other things: (1) contact information for "Cas" and "Tali" (that is, "Casper" and "Taliban"); (2) a screenshot of an NYPD Twitter post asking for information about the February 5, 2019 slashing and including a picture of the defendant; (3) a video of the slashing itself, recorded from afar; and (4) a video of El Combo members standing in front of the building on the night of the slashing. (GXs 301, 304, 356, 357.) Phone records also showed that two cellphones used by Polanco had made numerous calls to the victim on February 6.

### B. Procedural History

The defendant was charged in an Indictment with witness retaliation (Count One), conspiracy to commit witness retaliation (Count Two), witness tampering (Count Three), and conspiracy to commit witness tampering (Count Four). (Doc. No. 1.)

Before trial, the Government advised the defense that it would not proceed as to Count Two. At the conclusion of the Government's case, the Court dismissed Count Three and permitted Count Four to proceed only insofar as it was predicated on a conspiracy to tamper with the investigation/prosecution of the February 5, 2019 slashing, as opposed to some other crime by the

defendant. (Tr. 786–87.) The jury found the defendant guilty of Count One and not guilty of Count Four and found Polanco not guilty of County Four.

## II. The Applicable Guidelines Range

As to Count One, the Government agrees with the Guidelines calculation set forth in the PSR, at paragraphs 29 through 38, which results in an offense level of 21. The Government further agrees that the defendant has eight criminal history points and falls under Criminal History Category IV. (PSR ¶¶ 49–51.)

However, the Government respectfully submits that while the jury returned a not guilty version as to Count Four, the Government has proved Count Four as to the defendant by a preponderance of the evidence. The Victim testified that, the day after the slashing, the defendant and Polanco were on the same call to the Victim, and that during the call, Polanco said:

> I have nothing to do with what happened—I have nothing to do with what happened to you. You stop talking. You take my name out of your mouth. Just you wait. I'm going to come over to where you are.[1]

(Tr. 209.) The defendant, for his part, said to the Victim: "It was a good thing that that had happened to [the Victim]. He was kind of making fun, mocking, that he had [the Victim's] stuff." (Tr. 211.) As discussed, the Government's proof of Count Four included not only this testimony, but also corroborating evidence from Polanco's phone showing that Polanco was present the night of the slashing, had saved a screenshot of the NYPD's Twitter post about the slashing (which included the defendant's photograph), and had a hand-recorded video of the slashing itself. On the trial record, the Government submits that the Court can—and should—conclude that the defendant and the Polanco agreed to engage in an effort to dissuade the Victim from telling law enforcement about the slashing. There is no other reason why the two of them would have called the Victim together on February 6. Indeed, but for an agreement between the defendant and Polanco to stop the Victim from talking about the slashing, there was no reason why the Polanco would have so aggressively tried to initiate communication with the Victim the next day.

In the event the Court finds that the Government has proved Count Four by a preponderance of the evidence, the conduct underlying Count Four—which was intended to tamper with the investigation of the slashing charged in Count One—is "Relevant Conduct" under U.S.S.G. § 1B1.3. The Guidelines calculation for Count Four is as follows:

- Pursuant to U.S.S.G. § 2J1.2, the base offense level is 14.

- Pursuant to U.S.S.G. § 2J1.2(b)(1)(B), an 8-level enhancement applies because the offense involved causing or threatening to cause physical injury to a person in order to obstruct the administration of justice.

---

[1] In the transcript, "You stop talking" is mistakenly transcribed as "You stopped talking." Given the context of the surrounding statements, it is clear that the word should be "stop."

- Accordingly, the resulting initial applicable offense level for Count Four is 22.

- Pursuant to U.S.S.G. § 3D1.2(a)-(c), Counts One and Four are grouped because they involve substantially the same harm. Pursuant to U.S.S.G. § 3D1.3, the offense level applicable to the Group is the highest offense level of the counts in the Group, in this case, 22.

- Thus, if Count Four is included in the Guidelines calculation, the overall applicable offense level is 22.

At Criminal History Category IV, the defendant's Guidelines range is 57 to 71 months' imprisonment at offense level 21 (Count One only), and 63 to 78 months' imprisonment at offense level 22 (Count One and Count Four).

## III. Discussion

### A. Applicable Law

While advisory following United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines remain "the starting point and the initial benchmark" for sentencing proceedings. Gall v. United States, 552 U.S. 38, 49 (2007). A sentencing court must calculate the applicable Guidelines range, even if it imposes a sentence outside that range.

In imposing a sentence, the Court must consider the factors set forth at 18 U.S.C. § 3553(a), which include the "the nature and circumstances of the offense and the history and characteristics of the defendant," id. § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," id. § 3553(a)(6). The factors also include the "need for the sentence imposed"

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Id. § 3553(a)(2).

### B. The Court Should Impose a Sentence of 63 to 78 Months' Imprisonment

The Government respectfully submits that a sentence of 63 to 78 months' imprisonment is necessary to reflect the seriousness of the conduct, to provide just punishment, and to protect the public from additional crimes by the defendant.

Witness retaliation is a very serious crime. That is especially so here, where the defendant committed actual violence against the Victim and did so using a deadly weapon, a blade. In this case, the Victim suffered a deep cut along his jaw. Had the blade made contact just a few inches differently—for example, on the Victim's neck or throat—the consequences could have been much more severe, or even fatal.

The seriousness of the offense is not limited to its physical harm to the victim. Witness retaliation has an obvious and severe impact on the administration of justice. Trial evidence in many criminal cases—including cases involving violent organized gangs like the Trinitarios—necessarily includes the testimony of cooperating witnesses. Even when cooperators do not testify, information that they provide is critical to investigate and prosecute crimes such as murders, shootings, drug trafficking, and other forms of violence. It is no accident that the Trinitarios' constitution prohibits cooperation with law enforcement and that Trinitarios members are directed to retaliate against cooperators. (Tr. 547, 549.) Witness retaliation is core to how violent gangs reduce their exposure to prosecution and punishment. It deserves a significant sentence.

A significant incarceratory sentence is also necessary to protect the public from future crimes of the defendant, who has proven himself a repeat, violent offender. Apart from the gun and robbery convictions reflected in the PSR (PSR ¶¶ 40, 43, 44, 45, 47), the defendant participated in the shooting that led to the death of Issi Dominguez (id. ¶ 11). Moreover, the defendant was on parole at the time he committed the instant offense. (Id. ¶ 50.) In connection with his prior convictions, the defendant served a number of relatively modest prison sentences, none of which deterred him from committing this crime and none of which he used as an opportunity to rehabilitate himself. A more meaningful sentence is warranted here to achieve the purposes of sentencing.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 63 to 78 months' imprisonment. Such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

by: /s/
Allison Nichols / Jun Xiang
Assistant United States Attorneys
(212) 637-2366 / -2289

**CC (BY ECF)**

Andrew Dalack, Esq.
Mark Gombiner, Esq.